STATE OF NORTH CAROLINA v. TERRY WAYNE MICKEY

No. 303A95

(Filed 6 February 1998)

**1. Criminal Law § 1129 (NCI4th Rev.)— Fair Sentencing Act—conspiracy to murder—aggravating factor—inducement of another—same evidence not used for conviction and sentence**

The trial court did not err when imposing a sentence under the Fair Sentencing Act for conspiracy to commit first-degree murder by finding the statutory aggravator that defendant induced another to commit the offense. Although defendant contended that the trial court must have used the same evidence that the jury relied upon in finding the agreement element of conspiracy, the State introduced evidence tending to prove inducement in addition to that tending to prove agreement and the court did not need to rely on evidence necessary to prove the crime when finding the aggravating factor.

**2. Criminal Law § 1227 (NCI4th Rev.)— Fair Sentencing Act—mitigating factor—no record of convictions—not found—peremptory instruction in capital phase**

There was no prejudicial error when the trial court sentenced defendant under the Fair Sentencing Act for conspiracy to commit first-degree murder without finding the mitigating factor that he had no record of criminal convictions after peremptorily instructing the jury in the capital sentencing hearing to find the nonstatutory mitigating circumstance that defendant had no prior criminal convictions. The trial court ordinarily is not required to find the same mitigating factors in felony sentencing as were previously found by a jury in capital sentencing, and the burden under the Fair Sentencing Act is on defendant. Defendant here never produced any evidence of the factor and it will not be inferred from an otherwise silent record. There was error in the capital sentencing hearing in that the only support for the peremptory instruction was defense counsel's assertion at the sentencing charge conference, which was not probative; however, the error was in defendant's favor.

### 3. Search and Seizure § 56 (NCI4th)— items seized from murder scene—plain view—admissible

The trial court did not err in a capital first-degree murder prosecution (life sentence) by admitting into evidence items seized at the murder scene where the lead investigator on the scene ordered the seizure of evidence in the bedroom where the body was found; officers seized a bloodstained mattress and box springs; after the mattress and box springs were removed, officers found bullets on top of several pornographic magazines addressed to someone other than defendant; and the officers seized the bullets, magazines, and a credit card issued to someone not a member of the household which was on a desk eight feet from the body. Uncontroverted evidence indicated that the officers were lawfully securing the scene of a homicide and seizing evidence directly and obviously related thereto when they inadvertently discovered additional evidence which, by its nature and under the circumstances, was likely to lead to the identity of the killer or a material witness. The seizure was lawful under the plain view exception.

### 4. Evidence and Witnesses § 292 (NCI4th)— crimes for which defendant not charged—relevant to conspiracy—admissible

The trial court did not err in a prosecution for first-degree murder and conspiracy to commit murder by denying defendant's motion to exclude evidence of theft and unlawful use of credit cards, prior misconduct for which defendant had not been charged. Evidence of defendant's financial dealings with his co-conspirator was relevant to understanding the leverage defendant exerted in inducing and conspiring with him to commit murder, and, because defendant's use of stolen credit cards was important to understanding the nature of the conspiracy and the later murder, there is no basis for concluding that the trial court abused its discretion in ruling that the risk of prejudice did not outweigh the probative value.

### 5. Evidence and Witnesses § 3189 (NCI4th)— murder and conspiracy—statement of testifying witness to officer—admitted in part

The trial court did not err in a prosecution for first-degree murder and conspiracy to murder by admitting an unsworn statement to an investigating officer where the witness testified that

defendant had solicited him to commit the murder and that he had sold defendant the murder weapon, and his earlier statement to investigators, with portions removed, was admitted to corroborate the trial testimony. Although defendant argues that the removed portions were inconsistent with the testimony and that the trial court denied him the impeachment value of the inconsistencies, the removed portions would be more accurately characterized as new or additional facts. Most of the removed portions pertained to matters about which the witness was not asked on the witness stand and would have been more prejudicial to defendant than the witness's trial testimony or the statement as introduced. One removed portion was arguably inconsistent with the witness's testimony, but its value for purposes of impeachment would have been negligible.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Stanback, J., on 2 February 1995 in Superior Court, Randolph County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to the judgment sentencing him to imprisonment for twenty years for conspiracy to commit first-degree murder was allowed 1 July 1997. Heard in the Supreme Court 8 September 1997.

*Michael F. Easley, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by J. Michael Smith, Assistant Appellate Defender, for defendant-appellant.*

MITCHELL, Chief Justice.

Defendant was indicted on 5 August 1992 for first-degree murder and conspiracy to commit first-degree murder. He was tried capitally at the 7 November 1994 Criminal Session of Superior Court, Randolph County, Judge A. Leon Stanback presiding. The jury found defendant guilty of both charges. At the conclusion of a separate capital sentencing proceeding, the jury recommended a sentence of life imprisonment for the first-degree murder conviction. The trial court sentenced defendant to imprisonment for life for the murder conviction and imposed a consecutive sentence of twenty years' imprisonment on the conspiracy conviction.

The State's evidence tended to show *inter alia* that in the early morning hours of 29 June 1992, defendant's first cousin, Chris Cook,

entered defendant's home, where he shot and killed defendant's wife, Melissa Cooper Mickey. Defendant Terry Mickey had hired and conspired with Cook to perform the killing for $10,000. Cook ultimately confessed to the murder and implicated defendant.

Defendant and Melissa had been separated in 1985 or 1986 and later reconciled. Defendant had lived with another woman during their separation. Defendant later met Cindi Rinaldi, a co-worker at the post office, and began a relationship with her. Defendant told Rinaldi that he was planning to divorce his wife but that an attorney had advised that he wait until his bills were paid.

Defendant solicited Joe Ray to murder defendant's wife about eight months before she was killed. Ray refused to participate. Defendant asked Ray if his nephew would kill defendant's wife, and Ray said no. Defendant then asked Ray to get a gun for him, which Ray did.

Defendant's cousin, Chris Cook, was in the Marine Corps stationed at Virginia Beach when defendant phoned to ask if he knew of a way to raise $50,000. At one point, Cook and defendant planned to rob a drug dealer to raise money, but they did not go through with the plan.

In 1990 or 1991, Cook learned that defendant was making purchases and cash advances using credit cards he had stolen from the mail while he was a postal employee. Defendant sometimes gave Cook cash advances drawn on the stolen credit cards. Defendant also gave Cook a video cassette recorder and, in June 1991, an engagement ring for Cook's fiancée, paying for the purchases of those items with the stolen credit cards.

Cook was discharged from the Marine Corps on 3 September 1991. He broke up with his fiancée in January or February 1992 and pawned the ring, which defendant later redeemed from the pawn shop. In June 1992, defendant offered Cook $5,000 to kill defendant's wife Melissa. Cook refused the offer. Defendant repeated his offer to Cook on 14 June 1992. Defendant reminded Cook of all the cash and gifts he had given him. Cook continued to refuse the offer and tried to avoid defendant. Defendant went to Cook's house and promised to pay $5,000 before the killing and $5,000 after defendant received $50,000 from an insurance policy defendant had taken out on Melissa several months earlier. Cook finally agreed to defendant's scheme to kill Melissa.

STATE v. MICKEY

[347 N.C. 508 (1998)]

Defendant and Cook met at defendant's house on Sunday, 28 June 1992, to plan the murder. Defendant's children were at the beach with Melissa's parents, and he stated that he wanted the killing done that night or the next morning. Defendant met Cook at about 2:45 a.m. and took him to defendant's home. Defendant gave Cook a ski mask, surgical gloves, and a .38-caliber revolver loaded with six rounds of ammunition. Defendant told Cook to wait thirty to forty-five minutes before killing Melissa so defendant could establish an alibi.

Cook entered the house through a door left unlocked by defendant by prior arrangement and found Melissa lying in bed. He shot Melissa in the right jaw. She writhed her way to the far side of the bed. Cook went around the bed, where, firing through a pillow to muffle the sound, he shot her in the back of the head and through the back. He ran from the house, removed the mask and gloves, and hid the gun and mask under a pile of rocks. Cook then called his roommate for a ride home from a convenience store, where he was seen by witnesses. Cook told his roommate that he had been at a construction site early that morning. He claimed that because they had run out of supplies, he was jogging home when he fell and hurt himself.

When Cook arrived at his home, he washed his clothes and contacted his employer, Tim Edwards, to establish an alibi. He wanted Edwards to say that he had been working at one of Edwards' job sites early that morning. Thinking that Cook had gotten into some minor trouble, Edwards agreed to the scheme. Edwards later disavowed Cook's alibi when Edwards was questioned by investigators and realized that Cook wanted an alibi for the morning of the murder.

Melissa Mickey's friends and co-workers at L&M Floor Covering had become concerned that she had not come to work by the time defendant phoned and asked for her at 10:00 to 10:30 a.m. Annette Owens went to defendant and Melissa's home to look for Melissa. She found Melissa's car in the garage but did not find Melissa. She discussed her concerns with her co-workers and Garland Lawson, the store owner. Lawson contacted the Lenoir County Sheriff's Department to have a deputy check the house. Lawson met Deputy Greer at the house, and they went through it together. They found Melissa's body in a kneeling position on the floor at the side of the bed, with one elbow lying on the mattress. Lawson and Deputy Greer left the house, called for assistance, and waited outside.

Detective Sergeant Jeff Wilhoit arrived and helped secure the murder scene. Detective Don Andrews, the lead investigator, went

into the house and observed evidence in the master bedroom. Andrews ordered the seizure of evidence from the master bedroom. Officers seized evidence, including the bloodstained mattress and box springs, bullets found on top of several pornographic magazines, addressed to someone other than defendant, and the magazines themselves. The magazines and bullets were found under the bed after the mattress and box springs were removed. Officers also seized a credit card issued to someone not a member of the household which was lying on top of a roll-top desk.

In his first assignment of error, defendant contends that when imposing a sentence under the Fair Sentencing Act in excess of the presumptive sentence for his conspiracy conviction, the trial court erroneously found the statutory aggravating factor that defendant induced others to participate in the commission of the offense and erroneously failed to find the statutory mitigating factor that defendant had no record of criminal convictions. N.C.G.S. § 15A-1340.4 (1988) (repealed effective 1 October 1994). The Fair Sentencing Act applied to crimes committed before 1 October 1994; because the conspiracy in question here took place prior to that date, defendant was sentenced under this statute. Under the Fair Sentencing Act, "the sentencing judge must find and weigh aggravating and mitigating factors before imposing a sentence greater than the presumptive sentence set by the statute." *State v. Flowers*, 347 N.C. 1, 41, 489 S.E.2d 391, 414, at *22 (1997). We address defendant's two arguments in support of this assignment of error in turn.

[1] First, defendant argues that the trial court erroneously found the statutory aggravator that defendant induced Cook to participate in the offense. He contends that the trial court must have used the same evidence that the jury relied upon in finding the agreement element of the crime of conspiracy when the trial court later found the aggravating factor of inducement. Defendant contends that the only evidence supporting the inducement aggravator was identical to the evidence supporting the agreement element of the conspiracy. More specifically, defendant avers that evidence of his solicitation of Cook's participation was the only evidence supporting the jury's finding of the agreement element of the conspiracy charge and the only evidence supporting the trial court's finding the inducement aggravator in sentencing. We disagree.

A sentence is aggravated to account for a defendant's culpable conduct that goes beyond what was necessary to commit the crime for which he is being sentenced. *State v. Thompson*, 318 N.C. 395,

397-98, 348 S.E.2d 798, 800 (1986). The evidence used to establish an element of a crime cannot then be used to prove an aggravating factor of the same crime. *State v. Hayes*, 323 N.C. 306, 312, 372 S.E.2d 704, 707-08 (1988). However, evidence tending to show inducement and evidence tending to show agreement are not necessarily one and the same. *State v. Wilson*, 338 N.C. 244, 257, 449 S.E.2d 391, 399 (1994). In this case, the State introduced evidence in addition to that tending to prove the agreement element of the conspiracy, which additional evidence tended to prove inducement. The State produced evidence that defendant tried on several occasions to persuade Cook to kill his wife. Defendant offered to pay Cook. He went to Cook's home to try to talk him into killing his wife. He also reminded Cook of past favors in an effort to make him feel guilty and obligated. This evidence supported the finding that defendant induced Cook to enter the conspiracy and to kill Melissa.

Other evidence supported the jury's finding of the agreement element of the crime of conspiracy. Independent evidence tending to show agreement included evidence that defendant agreed to drive Cook to defendant and Melissa's house; defendant brought a gun, mask, and gloves for Cook; and defendant told Cook which door would be unlocked. Also, agreement could be inferred from the fact that Cook did in fact kill defendant's wife. Therefore, the trial court did not need to rely on evidence necessary to prove the crime when finding the inducement aggravating factor. The trial court properly found the aggravating factor that defendant induced Cook to kill his wife.

[2] Second, defendant argues in support of this assignment of error that, in sentencing him for the conspiracy, the trial court should have found the statutory mitigating factor that he had no record of criminal convictions. N.C.G.S. § 15A-1340.4(a)(2)(a). Defendant points out that in its capital sentencing instructions to the jury, the trial court peremptorily instructed the jury to find the nonstatutory mitigating circumstance that defendant had no prior criminal convictions. Defendant reasons that because of this instruction in the capital sentencing proceeding, the trial court was required to find the same mitigator when sentencing him under the Fair Sentencing Act for the felonious conspiracy. We disagree.

Under the Fair Sentencing Act, the trial court was required to consider the statutorily enumerated mitigating factors it found to exist. Furthermore, the trial court "must find a mitigating factor when the evidence is uncontradicted, substantial, and manifestly credible."

*State v. Tucker,* 329 N.C. 709, 725, 407 S.E.2d 805, 815 (1991). The burden was on defendant to produce such evidence and to prove the factor by a preponderance of the evidence. *Id.* However, the trial court ordinarily is not required to find the same mitigating factors in felony sentencing as were previously found by a jury in capital sentencing. *Id.*

In the instant case, defendant never produced any evidence of the statutory mitigating factor that defendant had no record of criminal convictions. Instead, defendant asserts on appeal that the finding of an analogous mitigator in the capital sentencing proceeding constitutes evidence of the mitigator for felony sentencing purposes. We will not infer from an otherwise silent record that defendant had no record of criminal convictions. *See State v. House,* 340 N.C. 187, 456 S.E.2d 292 (1995); *State v. Williams,* 274 N.C. 328, 163 S.E.2d 353 (1968). Defendant failed to produce evidence supporting the mitigator. Therefore, the fact that the trial court failed to find a mitigating factor in the felony sentencing proceeding under the Fair Sentencing Act that is analogous to the mitigating circumstance found by the jury in the capital sentencing proceeding is not error.

There was error related to the mitigator in question here, but it occurred in the trial court's capital sentencing instructions to the jury. There, the trial court peremptorily instructed the jury to find the nonstatutory mitigating circumstance that defendant had no record of criminal convictions. However, during the capital sentencing proceeding, the only support for that mitigating circumstance was defense counsel's assertion of it during the sentencing charge conference; thus, no evidence was introduced in this regard. In *State v. Thompson,* we said that the State's mere assertion that an aggravating factor exists does not require the court to find the factor in sentencing. *State v. Thompson,* 309 N.C. 421, 424-25, 307 S.E.2d 156, 159 (1983). Here, defendant's mere assertion that a mitigating factor exists was not probative of its existence. *State v. Jones,* 309 N.C. 214, 221, 306 S.E.2d 451, 456 (1983). The trial court erred in peremptorily instructing the jury at the capital sentencing proceeding to find this mitigating circumstance in the absence of evidence to support the finding. However, this error operated in favor of defendant in the capital sentencing proceeding and may well have caused the jury to reach its recommendation of a life sentence rather than the death penalty. For this reason, the error does not entitle defendant to a new sentencing hearing on the conspiracy charge. This assignment of error is overruled.

STATE v. MICKEY

[347 N.C. 508 (1998)]

[3] In his next assignment of error, defendant contends that the trial court erred by admitting into evidence some of the items seized at the murder scene. He contends that this evidence was not a proper product of the plain view exception to the warrant requirement. Defendant argues that the seizure of a credit card found on top of a desk just eight feet from the victim's body constituted an improper seizure not justified under the plain view exception. Defendant further argues that the seizure of several pornographic magazines addressed to someone other than defendant that were discovered under the bed after the mattress and box springs were properly seized and on which two bullets were found did not fall within the plain view exception. We disagree.

Initially, " '[i]t must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.' " *State v. Scott*, 343 N.C. 313, 328, 471 S.E.2d 605, 614 (1996) (quoting *Elkins v. United States*, 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 1680 (1960)). In the present case, we examine a search initially permitted under the exigent circumstances exception, the scope of which was incrementally expanded to include seizures under the plain view exception.

As explained by the United States Supreme Court, a seizure is lawful under the plain view exception when the officer was in a place where he had a right to be when the evidence was discovered and when it is immediately apparent to the police that the items observed constitute evidence of a crime, are contraband, or are subject to seizure based upon probable cause. *Horton v. California*, 496 U.S. 128, 110 L. Ed. 2d 112 (1990); *see State v. Church*, 110 N.C. App. 569, 430 S.E.2d 462 (1993). The North Carolina General Assembly has imposed an additional requirement, not mandated by the Constitution of the United States, that the evidence discovered in plain view must be discovered *inadvertently*. N.C.G.S. § 15A-253 (1988). *See generally Horton v. California*, 496 U.S. 128, 110 L. Ed. 2d 112 (rejecting the plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564 (1971), which indicated that discovery of evidence under the plain view exception must be inadvertent).

In the present case, defendant has not challenged the officers' right to secure the murder scene or seize evidence obviously related to the murder, such as the victim's body and the bloodstained mattress. Defendant concedes that the investigators were lawfully in the

bedroom carrying out these duties. We conclude that when investigators were securing the bedroom in which the murder victim was found, it would have been immediately apparent to them that the items bearing names other than the victim's or defendant's could be evidence of a crime, in that they were likely to reveal the identity of the killer or a material witness.

Defendant's contention that *Arizona v. Hicks* controls here and compels exclusion of the evidence is erroneous. In *Hicks*, officers lawfully entered the defendant's apartment to search for the shooter, additional victims, and weapons, after a bullet was fired through the defendant's floor, injuring a man below. *Arizona v. Hicks*, 480 U.S. 321, 323, 94 L. Ed. 2d 347, 353 (1987). One of the officers noticed some expensive stereo equipment in the defendant's otherwise squalid apartment. *Id.* Acting only on reasonable suspicion, the officer moved the equipment to gain access to the serial numbers, recorded the serial numbers, and reported them to headquarters. *Id.* at 323-24, 94 L. Ed. 2d at 353. After being informed that the equipment had been stolen in an armed robbery, he seized the equipment. *Id.* The Supreme Court of the United States concluded that by moving the equipment, the officer had conducted a new search separate and apart from the search permitted by the exigent circumstances exception for "the shooter, victims, and weapons that was the lawful objective of his entry into the apartment." *Id.* at 235, 94 L. Ed. 2d at 354. The Court held that this new search was not supported by probable cause and that the evidence it yielded must be suppressed.

In the present case, uncontroverted evidence indicated that the officers were lawfully securing the scene of a homicide and seizing evidence directly and obviously related thereto when they inadvertently discovered additional evidence which, by its nature and under the circumstances, was likely to lead to the identity of the killer or a material witness. The seizure of such evidence under these circumstances was lawful under the plain view exception. Defendant's assignment of error is overruled.

[4] Defendant next complains that the trial court erred when it denied his motion to exclude evidence of his prior misconduct—the theft and unlawful use of credit cards—for which he had not been charged. Defendant argues that the relevance of this evidence was questionable and that its value was outweighed by the danger of unfair prejudice and needless presentation of cumulative evidence. We disagree.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1983). Evidence of defendant's financial dealings with Chris Cook was relevant to understanding the leverage he exerted against Cook in inducing and conspiring with him to commit murder. Such evidence tending to show how defendant induced Cook was relevant to a determination of guilt on both charges. Here, the evidence tended to help the jury understand the friendship between defendant and Cook and how defendant exploited their friendship to induce Cook to commit murder. Specifically, the evidence tended to show that defendant used stolen credit cards to obtain cash and goods which he gave Cook and that he later reminded Cook of this fact to bring pressure upon him to agree to the murder. These mechanics of the conspiracy and murder were facts of consequence to the determination of guilt.

Furthermore, this Court has consistently held that Rule 404(b) is a "general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). The evidence in the instant case was properly admitted to prove more than defendant's propensity to commit an offense of the nature of the crime charged. *Id.* A jury could reasonably find that defendant's use of stolen credit cards to give money and other presents to Cook tended to establish one reason for Cook's eventual agreement to defendant's request to murder the victim and for Cook's entering into the conspiracy with defendant.

Defendant also contends that the probative value of the evidence was outweighed by its prejudicial nature and because it was a needless presentation of cumulative evidence. "Evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice . . . or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1983) (emphasis added). The determination to exclude evidence on these grounds is left to the sound discretion of the trial court. *State v. Wilson*, 345 N.C. 119, 478 S.E.2d 507 (1996). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. Riddick*, 315 N.C. 749, 340 S.E.2d 55 (1986). Defendant's use of stolen

credit cards was important to understanding the nature of the conspiracy and the later murder. Therefore, we see no basis for concluding that the trial court's ruling constituted an abuse of discretion. This assignment of error is overruled.

**[5]** Defendant's last assignment of error is that the trial court erred when it admitted into evidence, for purposes of corroboration, a witness' unsworn extrajudicial statement. Defendant objected to the admission of Joe Ray's unsworn statement to an investigating officer. Defendant contends that the statement was a prior inconsistent statement, until the inconsistent portions were removed. At trial, Ray testified that he sold the murder weapon to defendant and that defendant had solicited him to commit the murder. Ray's earlier statement to investigators, with certain parts removed, was then admitted to corroborate his trial testimony. Defendant argues that the portions of Ray's statement which were removed were inconsistent with his testimony and would have cast doubt on the credibility of his testimony. Defendant also argues that by admitting the statement with the inconsistent portions removed, the trial court denied him the impeachment value of the statement's inconsistencies with Ray's sworn trial testimony. He contends that Ray's credibility was thus improperly enhanced by a sanitized version of his actual statement, when the full statement actually contradicted Ray's testimony at trial.

For evidence to be admissible as corroborative, it "must tend to add weight or credibility to the witness's testimony." *State v. Farmer*, 333 N.C. 172, 192, 424 S.E.2d 120, 131 (1993). That corroborative evidence contains new or additional facts does not make it inadmissible. *Id.* However, contradictory statements may not be admitted under the guise of corroboration. *Id.*

In the present case, most of the removed portions of the statement which defendant contends were inconsistent with Ray's testimony would be more accurately characterized as "new or additional facts." Most of the removed portions pertained to matters about which Ray was not asked on the witness stand and would have been more prejudicial to defendant than either Ray's trial testimony or Ray's prior statement as introduced at trial. One removed statement, however, is arguably inconsistent with Ray's testimony. At trial, Ray testified that he had never been inside defendant's house. In his prior statement to the investigating officer, he said that he once went to defendant's house and stood about three feet inside the living room door.

This Court has stated that:

> A trial court's ruling on an evidentiary point will be presumed to be correct unless the complaining party can demonstrate that the particular ruling was in fact incorrect. *State v. Milby,* 302 N.C. 137, 273 S.E.2d 716 (1981). Even if the complaining party can show that the trial court erred in its ruling, relief ordinarily will not be granted absent a showing of prejudice. N.C.G.S. § 15A-1443(a) (1983).

*State v. Herring,* 322 N.C. 733, 749, 370 S.E.2d 363, 373 (1988). However, if the erroneous evidentiary ruling violates a right of the defendant guaranteed by the Constitution of the United States, the State has the burden of showing that the error is harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b); *see State v. Swindler,* 339 N.C. 469, 476, 450 S.E.2d 907, 912 (1994). Assuming *arguendo* that the evidence here was improperly admitted and implicated a right of the defendant under the Constitution of the United States, we nevertheless conclude that its value for purposes of impeachment would have been negligible. Therefore, the admission of the statement into evidence, as redacted by the trial court, was harmless beyond a reasonable doubt. This assignment of error is overruled.

For the foregoing reasons, we hold that defendant received a fair trial free of prejudicial error.

NO ERROR.